# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| BELINDA R. HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-cv-3135 |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Belinda R. Harris appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Harris filed Plaintiff's Motion for Summary Judgment (d/e 12).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 16).  Harris filed a reply.  Reply in Support of Plaintiff's Motion for Summary Judgment (d/e 18).  This matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be affirmed.

## STATEMENT OF FACTS

Harris was born on January 23, 1968.  She completed the 11th grade and previously worked as a waitress, cashier, general house worker, home attendant, and cook.  Harris alleged that she became disabled on July 10, 2014 (Onset Date).  The last date Harris was insured for Disability Benefits was December 31, 2019 (Date Last Insured).  Harris suffered from osteoarthritis of the sacroiliac joints, degenerative changes of the lumbar spine; herniated discs as L4-S1; stenosis of the lumbar spine; obesity; depression; generalized anxiety disorder; posttraumatic stress disorder (PTSD); and polysubstance abuse.  Certified Transcript of Proceedings before the Social Security Administration (d/e 8) (R.), 13, 27, 42, 43-46, 74-77, 81, 114, 262.

### EVIDENCE BEFORE THE FIRST EVIDENTIARY HEARING

On July 11, 2014, Harris went to the emergency room at Memorial Medical Center in Springfield, Illinois (Memorial), for exacerbation of chronic back pain.  Harris did not know of a particular incident that caused the exacerbation.  She reported low back pain that was a worsening of historic back pain. The pain was moderate, and her functional limitations were minimal. R. 460.  On examination, she had "vague tenderness" in the lumbar and belt-line region, full range of motion, normal muscle tone and

no swelling or tenderness in the extremities, and full strength in her lower extremities. She walked with a limp. R. 461. A lumbar x-ray showed mild degenerative changes with no fractures or misalignment. R. 472. She was given the NSAID Toradol and the muscle relaxant Flexeril. She felt better and was discharged. R. 462.

On July 14, 2014, Harris saw Dr. Christopher Gleason, M.D., for a follow up on her back pain. R. 531. Harris worked as a healthcare assistant and she noticed some back pain after she helped move a 200 pound disabled person. The pain radiated into her left hip. She felt better after the emergency room visit, but said she still had significant pain. On examination, Harris was 65 inches tall, weighed 235.5 pounds, and had a body mass index (BMI) of 39.33. Dr. Gleason noted that Harris was in mild distress and could walk independently in a balanced fashion with some obvious pain. She could heel and toe walk. Her range of motion in her lumbar spine was limited, and she had flattening and spasms of the lumbosacral spine, especially on the left side. Straight-leg-raising was negative and her senses were intact, and her strength was normal. Dr. Gleason continued her medications, but he noted that it was "too early" for physical therapy. R. 531.

On July 21, 2014, Harris saw Dr. John Wang, D.O., for continued back pain.  She reported numbness down her left leg.  On examination, Harris had mild paraspinal lumbar tenderness on palpation and her motor and sensory functions were intact. Dr. Wang referred Harris for a physical therapy evaluation and wrote a letter to excuse Harris from work between July 21 and July 23, 2014.  R. 525, 528.

On July 23, 2014, Harris saw Dr. Jatin Patel, M.D. for continued back pain.  She reported numbness and pain but denied any weakness or decreased mobility.  Her symptoms were worse with activity and better with sitting, NSAIDs, and muscle relaxant.  On examination, Harris' gait and stance were normal, and her extremities showed no cyanosis, clubbing, or edema.  She was anxious.  Dr. Patel continued her medication, told her to go to physical therapy, and recommended weight loss.  He provided a note for her work that stated that she could not engage in patient work that required heavy lifting at this time. R. 521-24.

On August 1, 2014, Harris saw her primary care provider Dr. Ashley MacDonald, D.O., for a follow up.  R. 516-20.  Harris reported continued back pain and numbness.  On examination, Harris had full range of motion in all her joints and 5/5 muscle strength throughout.  She had muscle spasms at the lumbar and upper thoracic spine with pain on palpation.  She

also had pain during range of motion testing of her spine and hips. R. 519. Dr. MacDonald continued Flexeril, stopped Naprosyn, and started nabumetone. Dr. MacDonald ordered an MRI and referred Harris for a rheumatology consult due to tests that showed a positive rheumatoid factor. R. 516.

On August 14, 2014, Harris saw Dr. MacDonald for a follow up on her back pain. Harris said the pain radiated down both her left and right sides but was worse on the left. She was okay sitting but had pain with activity. On examination, Harris had full range of motion of all joints with full muscle strength, her gait and stance were normal, her sensation to light touch was intact, but she had pain when moving, and she had painful spasms observed across the lower back, as well as mild edema in the lower extremities. R. 512. Dr. MacDonald excused Plaintiff from work from August 1 through August 19, 2014. R. 510-14.

On August 19, 2014, Harris had an MRI of her lumbar spine. The MRI showed normal alignment and signal characteristics and showed degenerative changes at L3-L4, L4-L5, and L5-S1. The most significant was a disc protrusion abutting the exiting left L4 nerve root, resulting in moderate left neural foraminal stenosis at L4-5. R. 509. Harris also had a minimal diffuse disc bulge with mild left neural foraminal stenosis at L3-4

and a mild diffuse disc bulge, facet hypertrophy, and mild left neural foraminal stenosis at L5-S1. R. 508-09.

On September 3, 2014, Harris saw a physical therapist for evaluation of her bilateral lower back pain.  R. 559-61.  She reported daily numbness and tingling on her left side that interfered with her sleep.  She rated her pain at the evaluation at 5/10 and said her pain was worse with activity including walking or standing for more than 10 minutes, prolonged sitting, getting out of truck, and sweeping and vacuuming.  Her worst pain in the last 48 hours was 8/10.  R. 559.  During the evaluation, Harris had a slowed antalgic gait, tenderness to palpation over the centralized lumbar spine, limited range of motion in her lower back with pain, positive passive and active straight-leg-raising with reports of low back pain, 3/5 strength in her gluteus maximus muscles bilaterally with low back pain, and 3+/5 strength in her hip abductors bilaterally. R. 560.  The therapist recommended four weeks of physical therapy sessions.  R. 561.

On September 9, 2014, Harris saw Dr. MacDonald.  R. 591-95.  She complained of back pain, right knee pain, and muscle cramps and put her pain at 7/10.  Her right knee gave out on her with popping and cramping. On examination, Harris had full range of motion of all joints with 4/5 strength in her lower extremities and 5/5 in her upper extremities. Her gait

and stance were normal and her sensation to light touch was intact.  R.

593-94.  Dr. MacDonald prescribed a steroid taper to rule out a rheumatoid

flare and continued the nabumetone prescription for back pain.  Dr.

MacDonald prescribed physical therapy and NSAIDS for her knee pain. R.

591.  Dr. MacDonald continued to excuse Harris from work through

September 26, 2014.  R. 590.

On September 10, 2014, Harris had an x-ray of her knees which

showed no fractures or other abnormalities.  R. 589.

On September 25, 2014, Harris saw Dr. Marcin Jungiewicz, D.O., for

osteopathic manipulative treatment (OMT).  R.  585. Harris reported

continued back pain that sometimes radiated down her left lower extremity

and rated her pain at 6/10.  R. 585.  On examination, Harris had

tenderness to palpation in the lumbar paraspinal areas bilaterally and

around the sacrum, positive straight-leg-raise tests bilaterally, left piriformis

tenderness, and intact sensation.  Dr. Jungiewicz performed OMT and

changed Harris' pain medication from nabumetone to tramadol. R. 585-86.

On October 13, 2014, Harris saw pain specialist Dr. Ferdinand

Salvacion, M.D.  R.  571.  On examination, Harris had a stiff gait with no

limp, intact motor and sensory in the bilateral lower extremities, limited

lumbar range of motion, tenderness to palpation in the midline lumbar

spine, and a positive straight-leg-raise test on the right. R. 572. Dr. Salvacion recommended a trial of lumbar epidural steroid injections. Harris agreed. R. 572. Dr. Salvacion administered injections on October 23 and November 6, 2014. R. 566, 569.

On October 31, 2014, Harris saw Dr. MacDonald. R. 580-84. Harris said the lumbar epidural steroid injections made her pain worse and she reported suicidal ideations. The pain was in her lower back and radiated into her left leg and sometimes her right leg. Her right leg gave out on her, but she did not fall. Sitting up straight made the pain a little better. The tramadol did not help much with the pain. R. 581. On examination, Harris had full range of motion of all joints, no neurologic focal deficits, and a normal gait and stance. She had no cyanosis, clubbing, or edema in her extremities. Dr. MacDonald prescribed aspirin, gabapentin, and Zoloft and referred her to a counselor. Dr. MacDonald instructed Harris to go to the emergency room if her mood worsened or she developed a plan for her suicidal ideations. R. 583.

On December 12, 2014, Harris saw Dr. MacDonald. R. 575-79. Harris reported suicidal and homicidal ideations "at times" for people who got in her way. She was only taking the gabapentin for her back pain and said that the counselor would not see her because of her insurance. She

was waiting to get a counselor from Memorial.  R. 576.  On examination, Harris had full range of motion of all joints, full muscle strength symmetrically throughout, normal gait and stance, and intact sensation.  Dr. MacDonald ended the prescription for tramadol.  R.  578. Dr. MacDonald prescribed an "Other Home Health Aid" for Harris' back pain but did not specify what this was in the written instructions. Dr. MacDonald directed Harris to go to the emergency room if she developed suicidal or homicidal ideations.  R.  575.

On February 16, 2015, Harris saw state agency psychologist Dr. Stephen Vincent, Ph.D., for a consultative mental status assessment. R. 606-09. Dr. Vincent observed that Harris' speech was adequate production with normal rate and volume and, at times, somatically preoccupied; her mood and affect were moderately to moderately-severely depressed; she was intermittently tearful throughout the examination; her thought processes were slow and deliberate yet logical, coherent, and relevant; eye contact and effort were fair; there was a disturbance in her quality of voice related to bronchial laryngitis; and she was able to communicate effectively with the examiner but did so being somewhat deliberate. R.  608.  Harris was not psychotic or suicidal.  Dr. Vincent's clinical impression was of

recurrent, moderately severe to severe major depression and generalized anxiety disorder. R. 609.

On February 18, 2015, Harris saw state agency physician Dr. Vittal Chapa, M.D., for a physical consultative examination. She came to the evaluation with a wheeled walker, but she was able to ambulate up to fifty feet on a flat surface without the walker. R. 611. She was 66 inches and weighed 244 pounds. She had 20/100 vision in her right eye with pinhole acuity of 20/70 and 20/40 vision in her left eye. Ankle reflexes were absent, and there was mild crepitation on palpation of the knee joints. She had no motor weakness or muscle atrophy and her pinprick sensation was intact in upper and lower extremities. She showed no evidence of paravertebral muscle spasms. Her grip strength was 5/5 bilaterally and she could perform fine and gross manipulations with both hands. R. 611. Lumbosacral spine flexion was subjectively thirty degrees; straight-leg-raise testing was negative bilaterally when sitting, but positive at 10 degrees bilaterally when supine. She had full range of motion in all of her joints. Dr. Chapa found no evidence of lumbar radiculopathy and no evidence of joint inflammation from rheumatoid arthritis. Dr. Chapa assessed lumbosacral pain syndrome and history of arthritis. R. 612.

On February 23, 2015, state agency psychologist Dr. Russell Taylor, Ph.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  R. 113-15, 117-19.  Dr. Taylor opined that Harris had an affective disorder and an anxiety disorder, and said her mental impairments caused mild restrictions on activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  R. 114.  Dr. Taylor also opined that Harris was moderately limited in her ability to: maintain attention and concentration for extended periods; perform activities within a regular schedule with regular, punctual attendance; complete a normal work day and work week without interruptions and perform at a consistent pace without unreasonable rest periods; and respond appropriately to changes in work settings.  R. 117-18. Dr. Taylor concluded:

> The [claimant] retains the mental capacity to understand and remember simple and detailed 3 and 4 step instructions. The [claimant] would have a moderate limitation persisting for a normal work period due to [medically determinable impairments].  The [claimant] could make work related decisions and could interact and communicate sufficiently in the work environment. The [claimant] could adapt to simple, routine changes and pressures.

R. 118.

On March 11, 2015, state agency physician Dr. Prasad Kareti, M.D., prepared a Physical Residual Functional Capacity Assessment of Harris. R. 115-17.  Dr. Kareti opined that Harris could:  occasionally lift 20 pounds and frequently lift 10 pounds; sit for six hours in an eight-hour workday; stand and/or walk for six hours in an eight-hour workday; occasionally balance, stoop, and climb ramps and stairs; and never climb ladders, ropes, or scaffolds.  R. 116-17.

On March 16, 2015, Harris had x-rays of her sacroiliac joints which showed mild osteoarthritis. R. 996.

On April 2, 2015, Harris saw Dr. MacDonald.  R. 628-30.  Harris said she received some relief from the gabapentin, but she still had burning pain up and down her spine.  She used a walker more due to her pain and reported unbearable pain in her knees and that her knees gave out on her. On examination, Harris had equal strength in her upper extremities, 4+/5 strength bilaterally in her lower extremities, a slow gait from pain, and intact sensation throughout.  R. 630.  Dr. MacDonald referred Harris for a consultation for her back and knee pain.  R. 628.

On May 7, 2015, Harris saw Dr. MacDonald complaining of continuing knee pain and headaches. She also had problems with her eyes and needed to see a glaucoma specialist.  Her mood was worse.  Dr.

MacDonald had previously changed her medication from Zoloft to Cymbalta. R. 801. On examination, Harris had 4+/5 strength in her lower extremity strength with 2+/4 deep tendon reflexes bilaterally and intact sensation. R. 803. Dr. MacDonald increased the dosage of the Cymbalta prescription, started Harris on Celebrex for her knee pain and continued the prescriptions for a muscle relaxer and gabapentin. R. 801.

On July 27, 2015, Harris saw Dr. Solmaz Bauk, M.D. She reported right flank pain on breathing which began after she had been "very active at the pool" over the weekend. R. 798. On examination, Harris had normal range of motion, reproducible pain and tenderness to palpation on the right side of the torso, normal judgment insight, and intact memory. She was anxious and depressed with a tearful mood and affect. R. 800. Dr. Bauk discontinued the Cymbalta because her insurance would not pay for it and started Harris on amitriptyline and ciprofloxacin, and renewed her bupropion prescription. He continued her prescription for gabapentin. R. 798.

On August 17, 2015, Harris saw Dr. Eun Kyung Lee, M.D. complaining of depression. R. 794-96. She reported a depressed mood and poor concentration but no suicidal ideations or psychomotor retardation. She reported daytime sleepiness and reduced concentration

due to sleep apnea.  R. 794.  On examination, Harris had normal gait and station, normal insight and judgment, a depressed mood, and a flat affect. Dr. Lee started Harris on fluoxetine and said she "failed to effexor, wellbutrin, and zoloft."  Dr. Lee continued the amitriptyline and gabapentin prescriptions and scheduled a sleep study.  R. 795.

On September 10, 2015, Harris saw Dr. Juniewicz for a preoperative examination. She was scheduled for eye surgery on September 14, 2015 for her glaucoma.  R. 791-93.  On examination, Harris was 5 feet 7 inches tall, weighed 247.2 pounds, and had a BMI of 38.72.  She had normal gait and station, normal muscle and tone, and normal mood and affect.  R. 792.

On October 9, 2015, Harris saw Dr. MacDonald. She reported continued knee pain and depression and suicidal ideations.  She said the prior doctor put her on amitriptyline even though she had a history of overdosing on the medication.  R. 788.  On examination, Harris had normal strength in her upper extremities and 4/5 strength in her lower extremities and no sensory loss.  R. 790.  Dr. MacDonald stopped the amitriptyline, renewed fluoxetine and gabapentin, and started vitamin D3. R. 788.

On October 20, 2015, state agency psychologist Dr. Erika Gilyot-Montgomery, Psy.D., prepared a Psychiatric Review Technique for Harris. R. 133-35.  Dr. Gilyot-Montgomery found that Harris had medically

Page **14** of **47**

determinable impairments due to affective disorders and anxiety disorders and opined that there was insufficient evidence to assess the severity of her mental impairments or functional limitations due to her mental impairments.  R. 134-35.

On November 9, 2015, Harris saw Dr. Vincent for another consultative mental status examination.  R. 676-79.  On examination, Harris had underproductive speech lacking inflection and intonation, a moderately depressed mood and affect, very limited facial expressiveness and emotional spontaneity, slow and deliberate thought processes with analytic or discriminatory thinking, slowed reaction time, fair to poor eye contact, and fair effort. She also appeared somewhat distant and defensive. R.  678.  She had difficulty staying focused on task due to preoccupation with pain.  However, she "was logical, coherent, and relevant."  R. 679.   Dr. Vincent assessed major depression, recurrent, moderate; generalized anxiety disorder; and somatic symptom disorder with predominant pain secondary to fibromyalgia and osteoarthritis.  R. 679.

On November 10, 2015, Harris saw Dr. MacDonald for a medication check.  Her son came with her to the visit. R. 782-84.  Her mood was not good, but she denied any suicidal or homicidal ideations.  Her son reported

that she drank heavily.  Once a week, she said that she drank a 12 to 18 pack of beer at one sitting.  Her son said she drank more like a 30 pack at one sitting.  She reported continuing pain in her back, buttocks, and legs. R. 782.  On examination, Harris had difficulty rising from her chair, had normal strength in her upper extremities, and 4/5 strength in her lower extremities, no sensory loss and normal mood, affect, judgment, and insight.  R. 784.  Dr. MacDonald stopped bupropion, started Abilify, and continued the fluoxetine. R. 782.

On November 17, 2015, state agency psychologist, Dr. Richard Hamersma, Ph.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  R. 135-39.  Dr. Hamersma found that Harris had severe impairments due to affective disorders and anxiety disorders and opined that she had moderate restrictions on activities of daily living; mild difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  R. 135.  Dr. Hamersma opined that Harris was moderately limited in her ability to:  understand, remember, and carry out detailed instructions; and maintain attention and concentration for extended periods.  R. 138-39.  Dr. Hamersma opined that Harris was not significantly limited in her ability to complete a normal workday and work

week.  Dr. Hamersma stated, "Claimant can carry out simple, routine instructions but would have difficulty with detailed ones due to her depressive symptoms and pain."  R. 139.

On December 15, 2015, Harris saw Dr. MacDonald.  R. 779-81.  She could not get the Abilify prescription filled due to her insurance and she was taking the fluoxetine. Her mood was down, but she denied any suicidal or homicidal ideations.  She used a walker all the time and stumbled from the pain, had difficulty standing, and walked slowly due to pain. R. 779.  On examination, Harris had a slow gait and used a walker.  Her range of motion was within normal limits; she had 5/5 strength in her upper extremities and "4/4" strength in her lower extremities, symmetric reflexes, and no sensory loss.  Her judgment, insight, mood, and affect were normal. R. 781.  Dr. MacDonald stopped the Abilify prescription and started Harris on Lyrica.  R. 779.

On January 11, 2016, Harris saw Dr. MacDonald.  R.  773-76.  She had a headache and also reported some suicidal ideations recently, but she said that she wanted to live.  She rated her ongoing pain at 7-8/10 and used a scooter to shop in stores.  R. 773-74.  On examination, Harris had a slow gait with a walker and had to get up and move around while in the room due to discomfort; she had 5/5 strength in her upper extremities and

4/5 strength in her lower extremities; she had no focal neurologic deficits and her reflexes were symmetric; she had normal judgment, insight, mood, and affect.  R. 776.  Dr. MacDonald administered a Toradol (ketorolac tromethamine) injection for her headache and had Harris wean off gabapentin to switch to Lyrica.  R. 773.

On January 12, 2016, Harris went to the emergency room at Memorial for a headache which she said she had had for a week. R. 1104-09.  She reported she received a shot from her doctor the day before.  The shot helped, but the headache returned, and was not like any she had in the past.  R. 1105  On examination, she had normal range of motion in her back and her extremities, normal strength, normal tone in her extremities, no focal neurologic deficits, and no swelling.  She had an appropriate mood and affect.  R. 1106.  A head CT scan showed no acute abnormalities.  R. 1107.  She was given Norco and felt better and was discharged.  R. 1108.

On February 9, 2016, Harris saw Dr. MacDonald for a medication check.  R. 770-72.  She only took one or two of the Norco pills she received from her emergency room visit, and the Norco helped with her pain.  She said her mood was okay on Seroquel 100 and she continued to experience pain in her back and knees. She was finishing a gabapentin wean and starting Lyrica. She still had muscle spasms at times but the Flexeril

helped. She also reported numbness and tingling in her wrists and from her elbows down to the lateral hands.  R. 770. On examination, Harris used a walker and had positive Tinel's signs bilaterally at both the cubital tunnel and at the wrist, and positive Phalen's tests bilaterally.  She had no focal neurologic deficits; normal judgment, insight, mood, and affect.  R. 772.  Dr. MacDonald prescribed bilateral carpal tunnel wrist braces, plus a continuous positive air pressure (CPAP) machine based on sleep study results.  R. 770.

On March 24, 2016, Harris saw Dr. MacDonald.  R. 764-66.  Her stress had been worse, and she had been irritable. She said that "she stopped all of her meds other than [A]leve."  She was drinking more and was having trouble sleeping without her medications.  She tried the CPAP two or three nights and did not think that it helped her sleep. R. 764. On examination, Harris used a walker, had normal range of motion, and had 4/5 strength throughout.  She again had positive Tinel's signs for cubital tunnel and at the wrists bilaterally, as well as positive Phalen's signs bilaterally. The left side was worse than the right.  She had symmetric reflexes and no sensory loss, was oriented and had normal judgment, insight, mood, and affect.  R.  766.  Dr. MacDonald scheduled an EMG study and told Harris to keep using the CPAP at night.  R 764.

On April 23, 2016, Harris was taken to the emergency room at Memorial by EMS at 4:18 a.m. after her husband found her intoxicated on the ground.  R. 930.  She reported drinking a 30-pack since 4:00 p.m., the day before and did not know if she fell.  She denied any head pain.  Her husband and EMS reported that she had suicidal ideation.  At the emergency room, Harris denied having any thoughts of hurting herself or others.  R. 930.  On examination, she had tenderness to palpation in her neck; she had normal range of motion and tone in her extremities with no swelling.  She had no observed focal neurologic deficits.  R. 931.  A head CT showed no acute abnormality.  R. 935.  A CT scan of her spine showed mild multilevel degenerative disc disease, but no fracture or malalignment. R. 934.  The emergency room physicians set Harris up with a bed at a crisis center to allow her to get away from the stresses at home and discharged her.  R. 931.

On May 3, 2016, Harris saw nurse practitioner Melanie Reynolds Plaintiff, N.P., to establish a primary care treating relationship with the physician with whom Reynolds worked, Dr. Nicole Florence, M.D.  R. 700-04, 808.  She was looking for a doctor who could help her with her pain and her depression.  R. 700.  On examination, Harris was 5 feet 5.5 inches tall, weighed 234.4 pounds, and had a BMI of 38.41.  Harris had wheezing over

both mid-lung fields, but she had no sign of respiratory distress. She had normal insight, judgment, mood, and affect; and intact memory. R. 702. Reynolds assessed arthralgia of multiple sites, asthma, major depression, diarrhea, and alcohol abuse. R. 703. She started Harris on an Advair discus and renewed the Lyrica prescription. R. 703.

On May 29, 2016, Harris went to the emergency room at St. John's Hospital in Springfield, Illinois (St. John's), for back pain. She said the pain was worse in the last two weeks and radiated up her spine to her neck but did not radiate into her legs. She rated her pain at a 9/10. R. 808. On examination, Harris had left paralumbar muscular spasms and diffuse lumbar tenderness, worse on the left. R. 810. A lumbar CT showed left foraminal stenosis at L4-5 secondary to a left foraminal disc bulge with osteophyte, extensive facet osteoarthropathy with mild degenerative disc disease of the lumbar spine, mild facet osteoarthropathy at L2-3, mild diffuse disc bulge and facet osteoarthropathy at L3-4, and facet osteoarthropathy at L5-S1. R. 813-814. Harris felt better after receiving morphine and was discharged with Zofran, naproxen, and Tylenol #3. R. 814.

On June 13, 2016, Harris saw nurse practitioner Christi Lanoue, N.P., in Dr. Florence's office for back pain. R. 846-49. Her back pain worsened

three weeks earlier.  On examination, she appeared uncomfortable, her gait and station were normal, and her reflexes were symmetric.  She had pain with inhalation, point tenderness in the left scapular area, and pain with lumbar range of motion in all planes.  Her muscle strength and tone were normal.  Her mood and affect were abnormal due to pain. R.  848. Lanoue changed the dosage of her Lyrica prescription and referred Harris for physical therapy evaluation, preferably for aqua therapy.  R. 849.

On July 7, 2016, Harris saw psychiatrist Dr. Philip Pan, M.D., for depression.  R. 695.  Harris said she had depression all her life.  She witnessed her mother being killed when she was five years old.  Her uncle raped her when she was 13 or 14 years old.  She reported she heard voices about a year before this office visit and she felt useless.  She also complained of memory problems and drank 12 to 18 beers once a week watching NASCAR.  She stated she was a crack cocaine addict, but she stopped four years ago, occasionally smoked cannabis when her depression worsened. R.  696. On examination, her mood was a 3 on a scale of 0 to 10, with 0 being suicidal, 5 neutral, and 10 manic; her affect was anxious, but not sad; she had decreased psychomotor function; she experienced hallucinations, paranoia, and passive death wishes.  Her insight and judgment were fair.  Dr. Pan stated that Harris would likely need

long-term psychiatric care.  He prescribed the antidepressant venlafaxine and a higher dose of Seroquel.  R. 698.  He stopped fluoxetine and renewed trazodone as well.  R. 699.  Dr. Pan assessed major depression, alcohol abuse, cocaine dependence in remission, generalized anxiety disorder, and PTSD.  R. 698-99.

On July 7, 2016, Harris went to the emergency room at Memorial complaining of constant left lower leg pain for a week.  R. 1003.  Her left leg and foot appeared swollen and felt tight to touch. She had pain mostly around the heel and knee area, but the pain extended along the calf and up to the groin area as well. Her right leg was normal.  R. 1004.  Harris declined having an MRI of her leg performed.  An ultrasound of her leg showed no evidence of deep vein thrombosis. R. 1005.  She was discharged home when she was stable and was prescribed Norco for the pain. R.  1006.

On September 20, 2016, Harris saw Dr. Pan.  R. 691-93.  She reported that her mood was terrible, and she was eating too much and gaining weight.  She was moving and her grandmother recently died.  R. 691.  On examination, Harris was ill appearing, her mood was 2 on a 0 to 10 scale, she was anxious, her affect was depressed, her psychomotor function was decreased, her judgment was fair, and her insight was fair.

Dr. Pan renewed her medication, told her to decrease her alcohol consumption, and referred her for counseling.  R. 692.

On October 5, 2016, Harris saw nurse practitioner Reynolds in Dr. Florence's office for back pain. Her back pain became severe a week earlier and she said the pain was worse with sitting, standing, walking, and sleeping in a supine position.  She had back stiffness and difficulty walking. On examination, Harris was uncomfortable, she had an antalgic gait and muscle spasms in her lower back, her range of motion was normal, and the range of motion in her hips was intact.  Reynolds assessed Harris to be stable. Her muscle strength and tone were normal, and her mood and affect were normal.  R. 826-27.  Reynolds increased her prescription for meloxicam and added prescriptions for prednisone and codeine.  R. 827.

On February 7, 2017, Harris saw Dr. Pan.  R. 688-90.  She had been sick with the flu and said her mood was the same, and her anxiety was okay.  She was overeating because of her depression and was down to drinking 12 beers one night per week.  R. 689.  On examination, Harris was ill appearing, her mood was a 3 on a 0 to 10 scale, her affect was tired and gloomy, her psychomotor function was decreased, her thought processes were linear, her thought content was normal, her insight was good, and her judgment was good.  She had no suicidal or homicidal ideations.  Dr. Pan

adjusted her medications and talked to Harris about limiting her alcohol consumption.  R. 689.

On March 29, 2017, Harris saw nurse practitioner Reynolds in Dr. Florence's office.  R. 919.  She fell two weeks earlier and complained of knots in her wrists.  She had not had a drink since March 17, 2017.  On examination, Harris had normal gait and station, normal stability, and symmetric reflexes.  Her insight, judgment, mood, and affect were normal.  Her recent and remote memory was intact.  R. 919.  Reynolds adjusted her medications.  R. 923.

At a visit on April 16, 2017, she complained of right wrist pain, and Dr. Florence observed mild tenderness to palpation over the right wrist, positive Tinel's and Phalen's signs, and 4/5 right grip strength, as well as pain on all range of motion of the wrist except for extension.  R. 917.  Dr. Florence encouraged conservative treatment with wrist splinting and anti-inflammatories. R.  918.

On May 12, 2017, Harris went to the emergency room at Memorial via EMS.  Harris' husband reported that she fell. R. 909.  She became dizzy, lost her balance, and fainted.  R. 910.  An x-ray at that time showed mild degenerative change without acute abnormality appreciated. R. 913.  On examination, her lower back was tender to palpation.  She was alert,

oriented, with normal sensation and no neurological deficits.  She had

normal range of motion.  R. 911.  A head CT scan and x-rays of her

cervical spine were normal.  R. 913-14.  She was discharged home. R.

915.

On May 27, 2017, Harris saw nurse practitioner Reynolds for right

wrist pain and left elbow pain.  Ice helped with the pain.  Harris said she

knew the EMG study was negative.  R. 902.  On examination, Harris' joints,

bones, and muscles were normal. She had normal range of motion in her

wrists and elbows and tenderness of the right base of the wrist with a

visible small prominence but not a palpable nodule.  Reynolds assessed

bilateral carpal tunnel syndrome and referred Harris for occupational

therapy.  R. 905.

On May 23, 2017, Harris saw Dr. Pan.  Harris said an uncle and

really good friend passed away.  She had lost 27 pounds and quit drinking.

She had one relapse when she drank eight beers, fell, and went to the

emergency room.  She said her mood was very depressed and she had no

energy.  Her anxiety was doing better and she met a counselor for the first

time the week before the office visit.  On examination, Harris was well

groomed and in no acute distress.  Her mood was a 5 on a 0 to 10 scale,

indicating neutral; her affect was calm and pleasant; her psychomotor was

normal, but she was using a walker; her thought processes were linear; her thought content was normal; her judgment was good; and her insight was good. She experienced no hallucinations or suicidal/homicidal ideations. R. 907. Dr. Pan noted that Harris still had significant depression with lack of energy and motivation. Dr. Pan adjusted her medication and told her to follow up with the counselor. R. 907-08.

On June 20, 2017, Harris saw Dr. Pan. She was having a bad day due to pain and said she had no energy due to the pain. She said her anxiety was "alright I guess." On examination, Harris was ill appearing; her mood was a 3 on 0 to 10 scale due to pain; her affect was dysphoric; her psychomotor function was decreased, using a walker with discomfort; her thought processes were linear; her thought content was normal; her insight was good; and her judgment was good. She experienced no hallucinations or suicidal/homicidal ideations. R. 1122. Dr. Pan remarked, "Seems somewhat better but having bad time [with] pain." Dr. Pan renewed her medications. R. 1122.

## THE FIRST EVIDENTIARY HEARING

On June 27, 2017, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  Harris appeared with her attorney.  R. 69-108.[1]

Harris testified that she lived with her boyfriend and her 28-year old son in a one-story house with a basement.  R. 80.  Her son had learning disabilities.  R. 90.  Harris did not have a driver's license and her boyfriend drove her to the hearing.  Harris completed the 11th grade and was in special education classes throughout her education.  R. 80-81.

Harris said she could not work because:  she had poor eyesight due to glaucoma; she had a poor memory; she could not sit or stand for long periods; she could not lift; and she could not bend or reach.  She also said her pain medications made her sleepy.  R. 83.  She could not stand or walk because of her back and her knees and had a walker at the hearing which she had used for three years.  She said that Dr. MacDonald recommended using a walker and she used the walker all the time when she was out of her home.  She hung onto to furniture to walk at home and had a motorized scooter to ride while grocery shopping.  R. 84.

---

[1] Vocational expert William T. Cody also appeared at the hearing.  R. 70.  The ALJ relied on the testimony of the vocational expert, Dr. James Lanier, Ph.D., who testified at the second hearing on March 29, 2018. The Court does not summarize Cody's testimony since the ALJ did not rely on that testimony.

Harris testified that she could walk half a block with her walker, but had to stop because of pain in her knees and her back.  She could stand for five minutes without leaning on her walker or some other object.  She could stand for 10 minutes if she had something to lean on and could sit for 10 to 15 minutes.  At the most, she could sit for 30 minutes.  Pain shot up her back when she was sitting.  R. 85-86.

Harris said she had good days and bad days.  She had about five good days a month and on a good day, she could do "a little dishes," sit and fold laundry.  Even on a good day, she could only fold about five towels before her arms would give out because she had carpal tunnel syndrome.  She continued, "Now, they're saying it's not carpal tunnel.  I don't think they even know."  R. 87.

If she lifted a gallon of milk, Harris experienced pain that went throughout her arms and into her back.  Her son carried everything for her.  R. 89-90.  Harris said that her son helped her with the laundry.  She walked downstairs to the laundry room in the basement, but her son carried the laundry up and down the stairs.  She held onto railings on both sides of the stairs when walking up and down the stairs.  R. 82.  Harris stated she could not bend at all and sometimes needed help dressing.  R. 90-91.

Harris testified that she could not lift her arms above her head.  If she tried, burning pain shot down her back to her legs.  She said the pain was due to fibromyalgia and arthritis.  R. 97.  Harris also stated she suffered from depression all her life and tried to kill herself about four times throughout her life.  Her depression got worse when she no longer worked and she had crying spells two to three times a week that lasted from 10 to 30 minutes.  She had anxiety and could not concentrate on one thing. R. 91-92.  She reported mood swings, "For a minute I can be a puppy dog and the next minute I'm a bulldog."  She also had memory problems.  R. 92.

On a typical day, Harris bathed in the morning, but her son sometimes had to help her.  She did not clean floors or bathrooms.  She could sit on her walker and wash dishes and could open prepared foods for meals, but she could not prepare meals.  She spent five to six hours a day lying down.  She usually watched movies, played on her phone, and fell asleep.  Harris slept because she felt worn out all the time.  R. 93-96.  Harris' testimony was complete.  R. 97.

### EVIDENCE AFTER THE FIRST EVIDENTIARY HEARING

On July 16, 2017, Harris went to the emergency room at Memorial via EMS for an acute overdose of Lyrica and trazadone.  Harris took handfuls of pills in front of family members and said she wanted to kill herself.  R.

1155.  She was given activated charcoal at the emergency room.  R. 1156.
She was admitted to the intensive care unit.  R. 1158.  She was discharged
on July 25, 2017, with diagnoses of major depressive disorder, cluster B
traits, and polysubstance abuse.  R. 1167.

On August 29, 2017, Harris saw Dr. Florence.  On examination,
Harris appeared chronically ill and older than her stated age; she had an
antalgic and weak gait requiring the use of a walker, and her mood and
affect were despairing.  Her muscle strength and tone were normal.  R.
1148.  Dr. Florence ordered an MRI of her lumbar spine.  R. 1149.

On September 18, 2017, Harris had an MRI of her lumbar spine.  The
MRI showed a small left subarticular disc herniation at L5-S1 that abuts the
left S1 nerve root, increased since the 2014 MRI; a small left foraminal disc
herniation at L4-5 that abuts the left L4 nerve root and contributes to
moderate left foraminal stenosis, appearing stable compared to the prior
MRI; and additional mild degenerative findings elsewhere, which appeared
stable.  R. 1130.

On October 22, 2017, Harris went to the emergency room for right
knee pain and swelling.  On examination, Harris' back was nontender and
had normal range of motion, her extremities had normal range of motion
and no tenderness except her right knee, she had no swelling in the knee,

and she had normal sensation.  She was discharged when she was stable, and told to follow up with Dr. Florence.  R. 1141-42.

On January 30, 2018, Harris went to the emergency room at Memorial by ambulance for an intentional drug overdose.  She took 15 trazadone and was drinking beer for a couple of hours.  R. 1254-55.  She was admitted to the hospital and discharged on February 5, 2018.  R. 1190. She was diagnosed with major depressive disorder.  R. 1191.

On January 23, 2018, Harris went to the emergency room at Memorial for pain with vomiting.  She reported severe right upper quadrant pain and nausea with vomiting.  She stated that this was not a new problem and became painful again today under her right breast.  She felt mild chest pain and shortness of breath.  R. 1135. An abdominal and pelvic CT was negative for acute pathology, but showed hepatic steatosis, features of a benign left renal cyst, and diverticulosis without diverticulitis. When she was stable, she was discharged.  R. 1138-1139.

## THE SECOND EVIDENTIARY HEARING

On March 29, 2018, the ALJ conducted a second evidentiary hearing. R. 40-67.  The ALJ had issued a decision on October 30, 2017 but vacated the decision because the ALJ made an error on the Date Last Insured.  The ALJ offered Harris a second hearing and she accepted.  See R. 10.  Harris

and her attorney appeared at the hearing.  Vocational expert Dr. James
Lanier, Ph.D., also appeared.  R. 42.

Harris testified at the second hearing that she lived with her
boyfriend, but her younger son no longer lived with her.  She did drive, but
did not go places alone because she would forget where she was going.
R. 49.

Harris said she was worse than she was at the first hearing.  She had
sciatic nerve pain that went down her right leg.  R. 49.  She had been
hospitalized once after she took 30 trazadone pills along with alcohol.  She
did not want to live.  R. 51-52.  She had stopped taking her medications
because she and her boyfriend broke up.  R. 52.  She started drinking
"quite a bit" for about a week.  R. 54.  The two since reconciled before the
hearing.  R. 47.

Harris saw a new mental health professional who prescribed new
medication that was helping.  R. 53.

Since the first hearing, Dr. Florence prescribed hydrocodone for
Harris' back pain which helped with the pain but made her so tired that she
just wanted to lie down.  The side effect of tiredness lasted for at least a
couple of hours.  She took the hydrocodone as needed and a prescription
of 20 tablets lasted about three months.  R. 55.  She still took

cyclobenzaprine for muscle spasms, but had spasms twice a week even
with the medication.  Each spasm lasted 30 minutes and she lay in bed
when she had a spasm.  R. 56.  She spent six hours a day in bed.  R. 58.

Harris still used a walker and said  Dr. Florence encouraged her to
use the walker around the house.  She did not because she did not have
enough room to maneuver the walker.  R. 57.

Harris had crying spells four times a week.  R. 58.

Dr. Lanier then testified.  The ALJ asked him to consider a
hypothetical person:

> For the first hypothetical I would like you to assume a
> hypothetical individual of the Claimant 's age, education and
> with the past jobs we just discussed. Further assume this
> individual can work at the light exertional level. Can frequently
> climb stairs and ramps. Never climb ladders, ropes or scaffolds.
> Occasionally balance, kneel, crouch, stoop or crawl. With no
> concentrated exposure to dust, odors, gases, poorly ventilated
> areas.

R. 60.  Dr. Lanier opined that such a person could perform Harris' prior
work as a waitress and cashier, but not her other past work.  Dr. Lanier
opined that such a person could also perform other jobs in the national
economy, such as a router, with 53,404 such jobs in the national economy;
a mail sorter, with 6,000 such jobs in the national economy; and a routing
clerk, with 41,326 such jobs in the national economy.  R. 61.  Dr. Lanier
stated that his answer would not change for the router, mail sorter and

routing clerk jobs if: (1) the person could only occasionally climb stairs and ramps; (2) the person was restricted to "work that could be learned in 30 days or less with simple routine tasks, simple work-related decisions and routine work place changes;" and (3) the person needed "an option to sit or stand changing positions no more frequently than every 30 minutes while remaining on task."  R. 62.  The person could not perform the prior work as a waitress or cashier if limited to repetitive work that could be learned in less than 30 days.  R. 64-65.

Dr. Lanier said that in order to maintain employment, the person needed to be on task at work 90 to 95 percent of the workday, could not miss more than one to one and one-half days of work per month, and could not consistently miss work.  Dr. Lanier stated a person who needed to take more breaks than the standard two breaks and lunch during a workday could not maintain employment.  R. 63-64.  The hearing concluded.  R. 67.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued her decision on July 27, 2018.  R. 10-29.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to

have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,

Step 3 requires a determination of whether the claimant is so severely

impaired that she is disabled regardless of her age, education and work

experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement at Step 3, the claimant's condition must meet or be equal to

the criteria of one of the impairments specified in 20 C.F.R. Part 404

Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If

the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the

Analysis.

Step 4 requires the claimant not to be able to return to her prior work

considering her age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to her prior work, then Step 5 requires a

determination of whether the claimant is disabled considering her RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  On the

last Step, the Commissioner has the burden to present evidence that,

considering the listed factors, the claimant can perform some type of

gainful employment that exists in the national economy.  20 C.F.R. §§

404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir.

2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Harris met her burden at Steps 1 and 2.  Harris

had not worked since her Onset Date and she had severe impairments of

mild osteoarthritis of the sacroiliac joints; mild degenerative changes of the

lumbar spine; small herniated discs at L4-S1; stenosis of the lumbar spine;

obesity; depression; generalized anxiety disorder; PTSD; and

polysubstance abuse.  R. 13.

The ALJ found at Step 3 that Harris' impairments or combination of

impairments did not meet or equal a Listing.  The ALJ considered Listing

1.04 for disorders of the spine:

> Listing 1.04 for a disorder of the spine is not met as the
> claimant does not have evidence of nerve root compression in
> a neuro-anatomic distribution with motor, sensory, or reflex
> loss, or spinal arachnoiditis confirmed by operative note or
> pathology report or lumbar spinal stenosis resulting in
> pseudoclaudication with an inability to ambulate effectively, as
> defined in 1.00(B)(2)(b).  Imaging did reveal some nerve root
> involvement but did not show any arachnoiditis.  Additionally, in
> spite of some nerve root involvement, physical examinations
> show the claimant's sensation and reflexes remained intact.
> Furthermore, while the claimant reported using a walker, there
> is no evidence that an assistive device was prescribed by a
> physician.  Treatment notes indicate the claimant maintained a
> normal gait during many exams. Accordingly, she does not
> meet or equal listing 1.04.

R. 15 (internal citations to record before the ALJ omitted).

Before reaching Step 4, the ALJ determined that Harris had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can frequently climb stairs and ramps, can never climb ladders, ropes, or scaffolds, and can occasionally balance, crouch, or stoop, and can never kneel or crawl. Work with no concentrated exposure to dusts, odors, fumes, gases, or poorly ventilated areas; and with an option to sit or stand, changing positions no more frequently than every 30 minutes, while remaining on task. With work that can be learned in 30 days or less, with simple routine tasks, simple work decisions, and routine workplace changes.

R. 17. The ALJ relied on: imaging that showed mild degenerative changes in Harris' lumbar and sacral spine; examinations that showed normal 5/5 strength or slightly diminished 4/5 strength; examinations that showed normal gait; Dr. Chapa's examination that showed full range of motion in all joints except her lumbar spine, the ability to walk 50 feet without assistance, no muscle atrophy, and her ability to manipulate objects was intact; records of inconsistent use of a walker with no record of her use of a walker from April 2015 to November 2015 and from March 2016 to May 2017, and no record of a prescription for a walker; numerous examinations in which Harris had normal mood, affect, concentration, and attention span; and examinations in which her memory was intact. R. 19-22. The ALJ also relied on the evidence that Harris' mental condition deteriorated when she

went off her medications and improved when she started seeing Dr. Pan
and got back on her medications.  R. 22-23.  The ALJ also relied on the
opinions of Dr. Kareti and psychologist Dr. Taylor.  The ALJ gave more
weight to Dr. Hamersma's opinion.  R. 26.

At Step 4, the ALJ concluded that Harris could not perform her past
relevant work.  R. 27.  At Step 5, the ALJ found that Harris could perform a
significant number of jobs in the national economy.  The ALJ relied on the
Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2,
and the opinions of Dr. Lanier that a person with Harris' age, education,
work experience, and RFC could perform the representative jobs of router,
routing clerk, and mail sorter.  The ALJ concluded that Harris was not
disabled.  R. 28.

Harris appealed the ALJ's decision.  On March 21, 2019, the Appeals
Council denied her request for review.  The decision of the ALJ then
became the final decision of the Defendant Commissioner.  R. 1.  Harris
then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine
whether it is supported by substantial evidence.  Substantial evidence is
"such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).
This Court must accept the findings if they are supported by substantial
evidence and may not substitute its judgment or reweigh the evidence.
Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782
F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation
of statements regarding the intensity, persistence, and limiting effect of
symptoms unless the evaluation is patently wrong and lacks any
explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,
367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);
SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social
Security Administration no longer uses the term credibility in the evaluation
of statements regarding symptoms).  The ALJ must articulate at least
minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d
329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical
bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,
872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The
evidence cited by the ALJ of imaging that showed mild degenerative
changes in Harris' back, combined with numerous examinations that
showed normal to near normal strength and range of motion with no

atrophy, and the examinations in which Harris had a normal gait without a

walker all supported the light RFC findings.  The examinations that found

normal mood, affect, concentration, and attention span supported the non-

exertional portions of the RFC finding.  The evidence that Harris' mental

condition improved when she saw Dr. Pan and followed her treatment

protocols also supported the non-exertional portions of the RFC finding.

The opinions of Dr. Kareti and psychologist Dr. Hamersma also supported

the RFC finding.  The RFC finding and the testimony of vocational expert

Dr. Lanier supported the conclusion at Step 5 that Harris could perform a

significant number of jobs that existed in the national economy.  The ALJ's

decision was supported by substantial evidence.

Harris raises two arguments on appeal; (1) the ALJ erred in her

evaluation of whether Harris' condition met or equaled Listing 1.04(A) or

(C) for disorders of the spine; and (2) the ALJ erred in failing to include in

the RFC Harris' moderate concentration-related impairment.  Harris raised

no other claims of error.  Plaintiff's Brief in Support of Motion for Summary

Judgment (d/e 13), at 1. The Court disagrees with Harris on both claims of

error.

Listing 1.04(A) and (C) provide:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus,
spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative

disc disease, facet arthritis, vertebral fracture), resulting in
compromise of a nerve root (including the cauda equina) or the
spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-
anatomic distribution of pain, limitation of motion of the spine,
motor loss (atrophy with associated muscle weakness or
muscle weakness) accompanied by sensory or reflex loss and,
if there is involvement of the lower back, positive straight-leg
raising test (sitting and supine);
or
. . . .
C. Lumbar spinal stenosis resulting in pseudoclaudication,
established by findings on appropriate medically acceptable
imaging, manifested by chronic nonradicular pain and
weakness, and resulting in inability to ambulate effectively, as
defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.04(A) and (C).  Substantial

evidence supported the ALJ's conclusion that Harris' impairments did not

meet or equal these Listings.  The record contains no evidence that Harris

had any "motor loss (atrophy with associated muscle weakness or muscle

weakness) accompanied by sensory or reflex loss," required by Listing

1.04(A).  The ALJ cited numerous examinations in which Harris' "sensation

and reflex remained intact," to support her finding.  R. 15.  Those

examinations provided substantial evidence to support her conclusion that

Harris' impairments did not meet or equal Listing 1.04(A).

The ALJ found that Harris' impairments did not meet or equal Listing

1.04(C) because she could ambulate effectively.  R. 15.  To ambulate

effectively mean to be able to walk effectively without either a walker or two assistive devices, such as two crutches.  See Listing 1.0B2b (definition of ambulate effectively).  The ALJ cited numerous medical examinations in which Harris had a normal gait without use of a walker or other assistive devices.  The ALJ also cited a lack of any evidence that a physician prescribed a walker for Harris. The evidence cited provided substantial evidence to support the ALJ's finding that Harris did not meet Listing 1.04(C) because such evidence supported the finding that she could ambulate effectively.  The ALJ did not err in her evaluation of Harris' impairments under Listing 1.04(A) and (C).

Harris argues that the ALJ erred by combining her analysis of the separate subsections of Listing 1.04 and because the analysis was "conclusory and perfunctory."  Plaintiff's Brief in support of Motion for Summary Judgment (d/e 13), at 18.  The Court sees no error.  The ALJ must minimally articulate the basis for the decision.  See Herron, 19 F.3d at 333.  The ALJ did so:  Harris had no motor loss accompanied by sensory and reflex loss, and Harris could ambulate effectively.  The ALJ adequately supported these findings with references to evidence in the record.  These findings demonstrate that Harris' impairments or combination of impairments did not meet or equal Listing 1.04(A) or (C).  The ALJ

minimally articulated the basis for her findings on this issue.  There was no error.

Harris also disputes the ALJ's analysis of the evidence.  Harris essentially asks the Court to reweigh the evidence.  This the Court will not do.  See Jens, 347 F.3d at 212.

Harris argues that the ALJ should have consulted with a medical expert to review the evidence to determine whether Harris met or equaled Listing 1.04.  Harris relies on Minnick v. Colvin, 775 F.3d 929 (7th Cir. 2015).  Minnick is distinguishable.  The ALJ's analysis in Minnick consisted of two short sentences with no citation to any evidence.  Minnick, 775 F.3d at 936.  The ALJ here acknowledged the imaging that showed some nerve root involvement but cited numerous medical examinations that repeatedly and consistently showed that Harris had intact sensation reflexes.  R. 15.  Listing 1.04(A) requires a sensory or reflex loss.  The medical examinations that showed no sensory or reflex loss provided substantial evidence to support the finding that Harris' impairments did not meet or equal Listing 1.04(A).  The ALJ was not required to consult a medical expert to evaluate the consistent clinical evidence that Harris did not have the required loss of sensation or reflexes to meet or equal Listing 1.04(A).  There was no error.

The ALJ also cited substantial evidence in the record that Harris could ambulate effectively.  R. 15.  Harris cites conflicting evidence, but the ALJ is the fact finder and this Court will not reweigh the evidence.  <u>Jens</u>, 347 F.3d at 212.  Harris' impairments did not meet or equal Listing 1.04(C) because she could ambulate effectively.  The ALJ again did not need a medical expert to review and evaluate the examination records that stated that Harris could ambulate effectively.  The ALJ did not play doctor.  There was no error.

The ALJ also had substantial evidence to support her treatment of Harris' moderate limitations on concentration in the ALJ's RFC finding.  Dr. Hamersma opined that Harris had moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. R. 135.  Dr. Hamersma also opined that Harris was not significantly limited in her ability to complete a normal workday and work week.  R. 139.  Dr. Hamersma further stated, "Claimant can carry out simple, routine instructions but would have difficulty with detailed ones due to her depressive symptoms and pain."  R. 139.  The ALJ relied on Dr. Hamersma's opinions.  R. 26.  The ALJ incorporated limitations that tracked Dr. Hamersma's opinions by limiting Harris to "work that can be learned in 30 days or less, with simple routine tasks, simple work decisions,

and routine workplace changes." The ALJ's RFC adequately accounted for Harris' moderate difficulties with concentration. See Jozefyk v Berryhill, 923 F.3d 492, 497-98 (7th Cir. 2019); Dudley v. Saul, 773 F.App'x 838, 842 (7th Cir. 2019).

Harris relies on the Seventh Circuit's decisions in DeCamp v. Berryhill, 916 F.3d 671 (7th Cir. 2019); Yurt v. Colvin, 758 F.3d 850 (7th Cir. 2014) and O'Connor-Spinner v. Astrue, 627 F.3d 614, 619 (7th Cir. 2014) to support her argument regarding the RFC finding. In those cases, the ALJ did not have expert opinion evidence on how moderate difficulties with concentration would translate into functional limitations that could be incorporated into an RFC. See DeCamp, 916 F.3d at 675-76; Yurt, 758 F.3d at 858; O'Connor-Spinner, 627 F.3d at 620-21. Here, Dr. Hamersma provided an expert opinion on the functional limitations that would accommodate Harris' mental impairments, and the ALJ followed that opinion in her RFC finding. Harris also asks the Court to reweigh the ALJ's evaluation of Dr. Vincent's opinions in light of the other evidence in the record. The Court will not reweigh the evidence. The opinion of Dr. Hamersma provided substantial evidence to support the relevant non-exertional portion of the ALJ's RFC finding. There was no error.

THEREFORE, THIS COURT RECOMMENDS that Defendant

Commissioner's Motion for Summary Affirmance (d/e 16) should be

ALLOWED, Plaintiff's Motion for Summary Judgment (d/e 12) should be

DENIED, and the decision of the Defendant Commissioner should be

AFFIRMED.

The parties are advised that any objection to this Report and

Recommendation must be filed in writing with the Clerk of the Court within

fourteen days after service of a copy of this Report and Recommendation.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely

objection will constitute a waiver of objections on appeal.  See Video

Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local

Rule 72.2.

ENTER:   July 30, 2020


_____s/ Tom Schanzle-Haskins_____

TOM SCHANZLE-HASKINS

UNITED STATES MAGISTRATE JUDGE